5 F.3d 547
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Mark A. PRADO and Lori Prado, Plaintiffs-Appellants,
v.
THE CITY OF PONCA CITY and E.B. Van Arsdale, and John Does,
as Police Officers and Employees of the City of
Ponca City through the Ponca City Police
Department, Defendants-Appellees.
 No. 92-6291.
 United States Court of Appeals, Tenth Circuit.
 Aug. 24, 1993.
 
 Before MOORE, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and WOOD, Senior Circuit Judge.[1]
 
 ORDER AND JUDGMENT[2]
 
 1
 Pursuant to 42 U.S.C.1983, Dr. Mark A. Prado, a doctor of chiropratic, and his wife, Lori Prado, brought the present action in the United States District Court for the Western District of Oklahoma against the City of Ponca City, Oklahoma, and E. B. Van Arsdale, a Lieutenant in the Ponca City Police Department. Also named as defendants were several John Does, as police officers and employees of Ponca City, none of whom was ever served.
 
 
 2
 In their first cause of action, the Prados asked for damages in the amount of $1,500,000 from both Van Arsdale and Ponca City. The gist of the first cause of action was that in executing a warrant authorizing a search of Dr. Prado's business offices and in "securing" those premises while awaiting the issuance of a search warrant, the defendants, acting under the color of state law, violated Fourth and Fourteenth Amendment rights guaranteed the Prados by the United States Constitution. In a second cause of action, the Prados asked for judgment against Ponca City in the amount of $1,500,000 based on the City's alleged failure to adequately train, supervise and control Officer Van Arsdale. In a third and pendent cause of action, the Prados alleged negligence on the part of Ponca City in hiring and supervising Van Arsdale and in connection therewith sought $750,000 from both defendants for pain and suffering, an additional $1,750,000 from both defendants for harassment, humiliation and embarrassment and $1,000,000 from Van Arsdale as punitive damages.
 
 
 3
 By answer, the City and Van Arsdale denied liability, the City alleging, inter alia, that the complaint failed to state a claim against it, and Van Arsdale, alleging, inter alia, that his actions were reasonable and that he was entitled to qualified immunity.
 
 
 4
 On motion, the district court granted summary judgment in favor of Van Arsdale on the ground that Van Arsdale's actions about which the Prados complained were "cloaked with qualified immunity." Later, the district court, on motion, granted summary judgment in favor of the City, concluding, inter alia, that the Prados had made no showing in support of their argument that "the police officer in the case at bar [Van Arsdale] was essentially running rampant, exercising unfettered discretion on how to enforce the law" and that there was "deliberate indifference of the City in overseeing him [Van Arsdale] and requiring officers to follow the current law as it existed at the time." Formal judgments in favor of both defendants were thereafter duly entered. Prados appeal therefrom.
 
 
 5
 The parties submitted several affidavits in support of, and in opposition to, the motions for summary judgment by Van Arsdale and the City. Some matters are in dispute. However, under F.R.A.P. 56(c), the question is whether such disputed matter presents a "genuine issue as to any material fact." If it does, then summary judgment was not in order. However, if notwithstanding the disputed matter, there is still no genuine issue as to a material fact, then summary judgment would be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Conaway v. Smith, 853 F.2d 789, 793 (10th Cir.1988).
 
 
 6
 The controversy between the Prados and Officer Van Arsdale had its genesis at about 10:00 o'clock p.m. on September 21, 1990, when Van Arsdale, armed with an arrest warrant, went to the Prado residence and arrested Dr. Prado. The warrant was based on an affidavit and an information filed in the District Court of Kay County, Oklahoma, wherein Dr. Prado was charged with obtaining cash or merchandise in excess of $50 by means of fraud and deceit, namely, a bogus check, which is a felony under Oklahoma statute. 21 O.S. 1541.2.[3]
 
 
 7
 After making the arrest, Van Arsdale took Dr. Prado to police headquarters where he was booked. During his booking, Dr. Prado removed eight capsules from his right front trouser pocket. These pills were in a clear plastic bag, unaccompanied by a prescription or prescription bottle.
 
 
 8
 There is, as indicated, some dispute as to just what Dr. Prado said to Van Arsdale at the time the former was being booked and the capsules were discovered. Van Arsdale, in his affidavit, said that Dr. Prado stated that he had been having trouble sleeping and that the pills helped him to sleep, that he couldn't remember the name of the doctor who had prescribed the capsules, and that he kept the capsules at his business office because he did not want his wife to know that he was taking them. In his affidavit, Dr. Prado stated that he did not tell Van Arsdale that he kept the capsules at his office, though he admits that he did make the following statement to Van Arsdale concerning where he had obtained the capsules: "I had been traveling quite a bit and had taken the clothes that I had on that evening out of my travel bag, which was in my office, and simply brought them home." (Emphasis added). In any event, Van Arsdale, after consulting an old copy of the Physicians Desk Reference, concluded that the capsules were Placidyl, which is a controlled dangerous substance under Schedule IV of the Uniform Controlled Dangerous Substance Act of Oklahoma.
 
 
 9
 Based on Van Arsdale's conclusion that the capsules discovered on Dr. Prado's person during the booking process were Placidyl, and based further on Van Arsdale's belief that there might be additional Placidyl at Dr. Prado's office, Van Arsdale contacted Shift Supervisor Sergeant Larry Kitchens and requested that he assign an officer to secure Dr. Prado's office against entry, pending the issuance of a search warrant. Officer Don Ray was then assigned to secure Dr. Prado's office. Van Arsdale was later informed that Lori Prado came to the office at approximately 12:30 a.m. on September 22, 1990, and wanted to go inside, but was turned back by Officer Ray.
 
 
 10
 In the meantime, Van Arsdale prepared an affidavit for a search warrant, which affidavit, after being approved by a representative of the district attorney's office, was presented to the Honorable Pam Legate, a Special District Judge for Kay County, Oklahoma, at approximately 2:00 o'clock a.m. on September 22, 1990. After reviewing the affidavit, Judge Legate signed a search warrant authorizing an immediate search of Dr. Prado's office.[4] This search warrant was executed by Van Arsdale, and others, at approximately 2:23 a.m. on September 22, 1990. The officers entered the premises by use of a key apparently given to them by the Prados. The search was completed by approximately 3:36 a.m. on September 22, 1990. No contraband of any sort was discovered in the search.
 
 Van Arsdale
 
 11
 As indicated, Van Arsdale filed a motion for summary judgment based on the doctrine of qualified immunity. Attached to his brief in support of the motion were various documents, including Van Arsdale's affidavit, a copy of the information charging Dr. Prado with obtaining cash or merchandise by means of a bogus check, and the search warrant, and the supporting affidavit by Van Arsdale, authorizing the search of Dr. Prado's business office. The Prados filed a response to the motion for summary judgment, attaching thereto, inter alia, the affidavits of each. As indicated, the district court granted Van Arsdale's motion for summary judgment on the basis of qualified immunity.
 
 
 12
 42 U.S.C.1983 creates a civil action at law, a suit in equity or other proper proceeding for redress against every person who, under the color of state law, causes another to be deprived of rights, privileges or immunities given by the United States Constitution or by federal statute. Hidahl v. Gilpin County Department of Social Services, 938 F.2d 1150, 1152 (10th Cir.1991).
 
 
 13
 The general rule is that in a 42 U.S.C.1983 proceeding a government official performing a discretionary function is not liable to respond in damages for his actions unless such action violates clearly established constitutional or statutory rights of which the official knew or should have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Hidahl v. Gilpin County Department of Social Services, 938 F.2d 1150, 1154-55 (10th Cir.1991); Hilliard v. City and County of Denver, 930 F.2d 1516, 1518 (10th Cir.1991); Pueblo Neighborhood Health Center, Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir.1988). Government officials performing discretionary functions are entitled to qualified immunity, shielding them from civil damages liability, if "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).
 
 
 14
 Based on the foregoing rule, which has been repeatedly followed in this circuit, the district court, based on the record before it, did not err in granting summary judgment for Van Arsdale. This was not a warrantless search of Dr. Prado's business office. A state district judge issued a search warrant based on Van Arsdale's affidavit. Certainly the record does not indicate that in executing that search warrant Van Arsdale knew or should have known that he was violating clearly established federal constitutional or statutory rights of the Prados.
 
 
 15
 Nor does the record indicate that Van Arsdale knew or should have known that his application for a search warrant violated the Prados' clearly established federal constitutional or statutory rights. It is not obvious that a reasonably competent officer in Van Arsdale's position would not have concluded that probable cause existed for the issuance of a warrant for the search of Dr. Prado's office. See Malley v. Briggs, 475 U.S. 335, 344-45 (1986) (An officer applying for a search warrant will lose the shield of immunity "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable."); see also Jones v. City and County of Denver, 854 F.2d 1206, 1208 (10th Cir.1988).
 
 
 16
 In their 42 U.S.C.1983 action, the Prados also complained about the fact that from about 11:00 o'clock p.m. on December 21, 1991 until around 2:30 o'clock a.m. on December 22, 1991, a period of some 3-1/2 hours, the police "secured" Dr. Prado's office and during that time prevented Lori Prado from entering the office. Van Arsdale's actions in "securing" Dr. Prado's business office until a search warrant could be obtained did not violate clearly established constitutional rights of the Prados. Indeed, in Segura v. United States, 468 U.S. 796 (1984), the Supreme Court held that police officers who "secured" certain premises in order to preserve the status quo while others, in good faith, were in the process of obtaining a search warrant did not violate the Fourth Amendment proscription against unreasonable searches and seizures.[5]
 
 Ponca City
 
 17
 The gist of the Prados' 1983 claims against Ponca City is that they were deprived of constitutional rights by Ponca City's "policy or custom." In Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), the Supreme Court held that municipalities are "persons" subject to liability under 42 U.S.C.1983, though not on the basis of respondeat superior. Rather, the Court said that municipal liability under 1983 could only be imposed for injuries inflicted pursuant to government "policy" or "custom."
 
 
 18
 In the complaint the Prados alleged that Ponca City had failed to adequately train, supervise and control Lieutenant Van Arsdale. In its motion for summary judgment, Ponca City asserted that it had no policy or custom which caused the deprivation of any of the Prados' constitutional rights. The motion was based on the pleadings, answers to interrogatories and affidavits. From such we learn that Lt. Van Arsdale had been a law enforcement officer certified by the Oklahoma Council on Law Enforcement Education & Training (CLEET) since 1980, had attended 121 police schools and had training of over 650 CLEET certified hours. We agree with the district court that on the record before it there was nothing to indicate that any "policy or custom" of Ponca City deprived the Prados of any constitutional right.
 
 
 19
 In Medina v. City and County of Denver, 960 F.2d 1493 (10th Cir.1992), we said, relying on Watson v. City of Kansas City, Kansas, 857 F.2d 690 (10th Cir.1980), that in order to survive a summary judgment in a 1983 proceeding against a municipality, a plaintiff must go beyond his pleadings and show that he has evidence of specific facts that demonstrate that the municipality "exhibited deliberate indifference towards him in its alleged failure to institute a proper policy and in not properly training and supervising the police officers." In Medina, we said the plaintiff there "did not meet this burden and indeed evidence in the record shows the contrary." The same observation can be made in the instant case concerning the Prados.
 
 
 20
 Judgment affirmed.
 
 
 
 [1]
 Honorable Harlington Wood, Jr., Senior Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [2]
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3
 
 
 [3]
 As we understand it, Dr. Prado does not base his present claim under 42 U.S.C.1983 on his arrest by Van Arsdale on the Oklahoma warrant
 
 
 [4]
 In a proceeding under 42 U.S.C.1983 we are not concerned with the Oklahoma statute regarding so-called "night time" searches. 22 O.S. 1230. See, Jones v. City and County of Denver, 854 F.2d 1206, 1209 (10th Cir.1988) (Section 1983 does not provide a basis for redressing violations of state law.)
 
 
 [5]
 In light of Segura, the affidavit of Bob Graham that securing premises while awaiting a search warrant was not a "commonly established practice" is not very persuasive